IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 18, 2018 at Knoxville

**STATE OF TENNESSEE v. STEVEN MICHAEL ODOM**

**Appeal from the Circuit Court for Tipton County**
**No. 8761    Joseph H. Walker, Judge**

**No. W2018-00634-CCA-R3-CD**

The Defendant, Steven Michael Odom, appeals his jury convictions for aggravated burglary and theft of property $500 or more but less than $1,000. The Defendant alleges that (1) the evidence was insufficient to support his jury convictions, challenging the evidence establishing his entry into a habitation and his criminal responsibility for the actions of his co-defendant; and (2) that the trial court's refusal to play for the jury the portion of the Defendant's police interview during which the Defendant stated adamantly that he was telling the truth was error. Following our review of the record and the applicable authorities, we conclude that the Defendant's issues do not entitle him to relief. However, we find plain error because the trial court failed to apply the amended theft grading statute at sentencing. Accordingly, we vacate the two-year, Class E felony sentence for the Defendant's theft conviction, and the case is remanded for entry of a modified judgment reflecting an eleven-month and twenty-nine-day sentence for a Class A misdemeanor conviction of theft of property valued at $1,000 or less. Furthermore, upon remand, it shall be noted on all three judgment forms, including the Defendant's guilty plea to felon in possession of a weapon offense, the concurrent nature of the Defendant's various sentences. In all other respects, the judgments are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court**
**Affirmed in part; Modified in part; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Lauren A. Raynor, Brighton, Tennessee, for the Appellant, Steven Michael Odom.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James

Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

A Tipton County grand jury charged the Defendant, along with his co-defendant, Bryan Adam Pilkington, with aggravated burglary and theft of property valued at $500 or more but less than $1,000. See Tenn. Code Ann. §§ 39-14-103, -105, -403. The Defendant was also charged with being a felon in possession of a weapon. See Tenn. Code Ann. § 39-17-1307. The Defendant proceeded to a jury trial on the theft and burglary charges.

At trial, the Defendant's father, Ben Odom ("Mr. Odom"), testified that he lived on Kelleys Chapel Road with his fourteen-year-old son, W.O.,[1] but the Defendant did not live with them. According to Mr. Odom, he left his home around 9 a.m. on Saturday, May 28, 2016, and returned later that evening around 5:00 p.m. Mr. Odom could not recall exactly what he was doing that day, explaining, "When I'm not working at work, I'm always doing something or helping somebody. If not at my house, I'll be like cutting grass at the church, or it's all kind of stuff. I go out and stay busy all the time." Mr. Odom testified that, when he returned home, the front door was still locked, but as he entered his bedroom, he immediately noticed that a cabinet had been pulled away from the wall and that two shotguns, one a 12 gauge and the other a 20 gauge, he kept behind the cabinet were missing. Though there were other items of value inside the home, including electronics and other weapons, nothing else was stolen. Mr. Odom called the police right away and "made a report."

Mr. Odom discovered a few weeks later that a jar full of change he placed on top of the freezer was also missing. He estimated that the jar contained "about 50, 60, 70 dollars['] worth of change[.]" Mr. Odom called the police and added the jar to the report he had previously filed.

In addition, Mr. Odom testified that W.O. sometimes lost his keys, so W.O. would enter the house through a bedroom window that did not latch. Mr. Odom said that there were both a stepladder and a chair near the window to facilitate W.O.'s entry. But, the Defendant was a "big guy," and it would have been "very difficult" for the Defendant to fit through the window, in Mr. Odom's opinion. Mr. Odom explained that he himself had difficulty climbing in the window due to his size but that it was not impossible for either Mr. Odom or the Defendant to make it through the window. According to Mr. Odom, "[the Defendant] probably would have [had] to turn sideways" to fit in the window, like Mr. Odom did. Mr. Odom said that it hurt him to climb through the window sideways.

---

[1] It is the policy of this court to refer to minors by their initials.

Mr. Odom believed that it would have been much easier for the co-defendant to fit through the window.

According to Mr. Odom, the Defendant knew about the window's being unlocked, and the Defendant also knew where the shotguns were kept. Finally, Mr. Odom confirmed that he did not give the Defendant or the co-defendant permission to enter his home that day.

Subsequently, the police recovered the shotguns from Christy Sanders, who was the wife of John Sanders. Mr. Odom went to the police station on June 16 and identified the shotguns as his. Mr. Odom estimated that the two guns were worth about $600.

During the morning of June 14, 2016, the Defendant gave a statement to police after signing a <u>Miranda</u> waiver. The interview, which was conducted by Detective[2] Dustin Henshaw of the Tipton County Sheriff's Office, lasted about forty-minutes and was video recorded. At the conclusion of the interview, around 11:00 a.m., the Defendant signed a written synopsis of his statement. The Defendant's version, as typed by Detective Henshaw, provided the following:

Around May, Bryan and me [sic] went to my father's house on a Sunday because I knew dad would be at church. Bryan needed money and John Sanders wanted a shotgun. We took a black Saturn and Bryan drove. We parked in the drive by the house like normal. I got out and knocked. No one answered so I told Bryan to go ahead. We originally went out there to scope out some AC units. I walked around back to make sure he got in. He was going to pry open the back door but the window was open and we saw a chair under the window. I then walked down to the neighbor's AC unit to scope it out and when I got back Bryan was already in the car. We left and went to Kroger in Atoka and Bryan got $35.74 for the change. I shopped. The next day we took the pump 20 gauge to John Sanders. Bryan got a gram of methamphetamine for the gun. I stayed in the car. About a week and a half ago, Bryan and I went and got the 12 gauge from Brandon Lillie. This was on the second of June. I took Bryan back home and then I took the 12 gauge to John Sanders to pay off a debt. I gave it to his wife at the gate. John didn't give me anything that day.

We were going to steal "dro" from Verly Wells on Mae Sigma. He keeps it in the grill. Verly's dad was at home so we didn't. My dad goes to church on the same road and I thought I saw his red truck at church so I

---

[2] By the time of trial, Detective Henshaw had been promoted to Investigator.

knew he wouldn't be home. I said I would knock and if no one answered Bryan could go in the back because people could see from the front.

A short break was taken after Detective Henshaw read the Defendant's statement into the record. During the break, the prosecutor announced his intention to play the video recording of the Defendant's interview. In order to delete any reference to separate armed robbery charges against the Defendant and his co-defendant that involved John Sanders, the prosecutor said that he would begin the recording at 10:44 a.m. Defense counsel noted her concern "with the entire video not being played" because "at 10:36, there [was] a point where [the Defendant] [was] saying his statement over and over so that" the detective would believe him. She wanted the jury to see that the Defendant stated adamantly that the information he provided was truthful. The trial court ruled that the State could play the recording beginning at 10:44 a.m. and that, if defense counsel "want[ed] other parts played," then they would take a break to address those additional portions. Defense counsel replied, "Yes, sir." The prosecutor noted that defense counsel could "[c]ertainly" ask the detective about the Defendant's comments. The jury returned to the courtroom, and the delineated portion of the video recording was played.

On cross-examination, the following colloquy between Detective Henshaw and defense counsel took place:

Q. . . . And the video that you played, you asked him if this was the absolute truth?

A. Correct.

Q. And he told you over and over again that this was the truth, correct?

A. Yes, mam.

Detective Henshaw then affirmed that the Defendant never stated that he was the one who climbed through the window, steadfastly maintaining that it was the co-defendant. Detective Henshaw was asked, "And even in that video, you asked him several times, man, I know you're not telling the truth, and he still said that he did not climb in, correct?" Detective Henshaw replied in the affirmative. When asked if the Defendant ever changed his story, Detective Henshaw said, "Nothing drastic. He would give me a few more details here and there[.]"

In addition, Detective Henshaw confirmed that, at the time of the interview, the Defendant was being utilized as a confidential informant by the Tipton County Sheriff's Office. Moreover, Detective Henshaw also conducted a separate interview with the co-defendant.

The co-defendant testified at the Defendant's trial. The co-defendant confirmed that he had pled "no contest" that morning to the aggravated burglary and theft charges involving the two shotguns stolen from Mr. Odom on May 28, 2016. The co-defendant further acknowledged that he had previously made a statement to law enforcement on June 14, 2016, regarding these events.

When asked to provide a narrative of the events that day, the co-defendant stated that, around 8:30 or 9:00 a.m., he was driving the Defendant's girlfriend's Saturn Ion and that he and the Defendant were "just cruis[ing]" and thinking about stealing some marijuana. They decided to go to the Defendant's father's house to steal two shotguns, believing that Mr. Odom was at church and not at home. When they arrived at the house, they did not see Mr. Odom's truck in the driveway. According to the co-defendant, the Defendant exited the car and went to the backyard of the home where the Defendant crawled inside through a "[n]ormal-sized window" using a "little stepladder" that was nearby. The co-defendant claimed that the Defendant did not have any trouble climbing in the window. The co-defendant said that he waited outside and that the Defendant returned with the two shotguns and a jar full of change. They left.

The co-defendant testified that they took the jar of change to a Kroger in Atoka; that he was the one who converted the coins to cash, receiving approximately $28; and that they then "went shopping for about an hour" before returning to their home. According to the co-defendant, they did not use the money they garnered from the change jar for groceries but instead used the Defendant's girlfriend's "food stamp card." The co-defendant said that they "spent" the $28, although he did not provide specifics on what they purchased.

When asked what happened to the shotguns, the co-defendant testified that initially they used the 20 gauge shotgun to pay the Defendant's drug debt to John Sanders and hid the 12 gauge shotgun at Brandon Lillie's house. However, the co-defendant maintained that they sold the 12 gauge shotgun several days later in exchange for "[a] little over half a gram" of methamphetamine from John Sanders, which they "split . . . down the middle." According to the co-defendant, both shotguns were in John Sanders's possession at the time the co-defendant spoke with law enforcement on June 14.

On cross-examination, the co-defendant admitted that he could not remember the exact dates these events occurred, believing that they occurred sometime in May. The co-defendant acknowledged that certain details in his police statement were untrue, including his statements therein that these events occurred in March and that he was the owner of the Saturn they were riding in that day. The co-defendant also did not mention a stepladder or chair when he spoke with Detective Henshaw.

The Defendant testified on his own behalf. The Defendant provided that, in May 2016, the co-defendant "was staying with" him. According to the Defendant, they were riding around May 28, 2016, in the Defendant's girlfriend's Saturn with the intention of stealing marijuana to pay the co-defendant's drug debt to John Sanders. Both he and the co-defendant had been using methamphetamine. When they discovered that the person from whom they intended to steal the marijuana was at home, they drove by Central Baptist Church where they saw the Defendant's father's truck. Because the truck was parked at church, the Defendant believed that these events occurred on a Sunday, not a Saturday.

After seeing the truck, the Defendant told the co-defendant about the shotguns at his father's house because the Defendant knew that John Sanders "was also interested in purchasing shotguns." According to the Defendant, they went to the Defendant's house and drove by "once or twice just to make sure that [his father] hadn't got out of church or left church early for some reason." The Defendant exited his vehicle and knocked on the front door for about five minutes. When no one answered, the Defendant walked around to the back of the house and told the co-defendant that "it was safe for him to go on in[.]" The Defendant claimed that "[t]here was a white chair sitting outside of the middle bedroom window of the house[,]" so the co-defendant used the chair to climb in the window. According to the Defendant, he did not know that the window was open until the co-defendant told him. In addition, the Defendant claimed that the window was too small for him to climb through.

The Defendant maintained that, while the co-defendant was inside, he walked to a neighbor's house looking to "see if there was any extra AC units in the window or anything that [he] could take for scrap." When the Defendant was walking back towards his father's house, he saw the co-defendant standing outside the Saturn. According to the Defendant, the co-defendant put the guns and the jar of change in the trunk and got inside the car. The Defendant confirmed that they then went to Kroger in Atoka to convert the change to currency. The Defendant asserted that the co-defendant took the change to the machine to be converted and that the jar of change got them $35.74.

The Defendant claimed that, the following day, both he and the co-defendant went to take the 20 gauge shotgun to John Sanders to pay the co-defendant's drug debt, and they both went in order "to make sure that neither one of [them] got screwed out the extra that was given" in return for the weapon. The Defendant also claimed that the 12 gauge shotgun was used to reimburse John Sanders approximately "three weeks later," on June 2, 2016, for another debt of the co-defendant. The Defendant rationalized, "[I]f we planned on ever getting anymore methamphetamine, this is who it had to go to." According to the Defendant, they went to Brandon Lillie's house to retrieve the 12 gauge

before going to the Sanders's residence, and the Defendant delivered the 12 gauge to Christy Sanders "outside the gate to pay off [the co-defendant's] debt."

On cross-examination, the Defendant averred that his trial testimony was the same as the details he provided to Detective Henshaw during the interview. The Defendant noted that he was "adamant" in the video that it was the co-defendant who went inside his father's residence and that this was even after the Defendant was told that it did not "really matter which one of [them] went" inside in order to establish culpability. Nonetheless, the Defendant acknowledged that he, "at the very least[,] assisted [the co-defendant] in this aggravated burglary" and that he "got some of the proceeds or the benefit of the proceeds of this aggravated burglary[.]" The Defendant further admitted that he was the one who knew that the shotguns were inside his father's house and that they did not have permission to take them. The Defendant also acquiesced that he handled the shotguns after they were stolen and that they were used to pay debts to his drug dealer and in order to secure drugs in the future.

On redirect, the Defendant confirmed that he had acted as a confidential informant for the Tipton County Sheriff's Office and maintained that he "had nothing to hide[.]" He affirmed that, during his interview, he said "no, no, hell no, this is the truth[,]" even "slap[ing] the table[,]" and that he was asked "[a]t least [twenty] times" if his statement was true. The Defendant acknowledged that he was "guilty of some crime," but he claimed it was not aggravated burglary because he was not the person who entered the home.

Following the conclusion of the proof, the jury found the Defendant guilty as charged of theft and aggravated burglary. The Defendant thereafter pled guilty to the felon in possession of a weapon offense. On January 12, 2017, he was sentenced, as a Range II, multiple offender, to concurrent terms of six years, two years, and four years, respectively, and judgment forms were filed that same day. The Defendant's motion for new trial was filed on September 17, 2017, well past the thirty-day time limit. See Tenn. R. Crim. P. 33(b). No motion is contained in the appellate record before us. A hearing was held on the motion on March 19, 2018. The only issue raised during the hearing was sufficiency of the evidence. The trial court thereafter dismissed the motion as untimely and concluded that the evidence was sufficient to support the jury's verdict. A notice of appeal was filed on April 6, 2018. The case is now before us for our review.

## ANALYSIS

On appeal, the Defendant argues (1) that the evidence was insufficient to support his jury convictions, challenging the evidence establishing his entry into a habitation and his criminal responsibility for the actions of his co-defendant; and (2) that the trial court's refusal to play for the jury the portion of the Defendant's police interview during which the Defendant stated adamantly that he was telling the truth was error. Before beginning

our review of the Defendant's issues, we feel constrained to note that the failure to timely file a motion for new trial results in the waiver of all issues except for sufficiency of the evidence and sentencing. See State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) (citations omitted); see also Tenn. R. App. P. 3(e).

## I. *Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the convicting evidence supporting his aggravated burglary and theft of property convictions. Specifically, the Defendant argues that "the evidence only points" to the co-defendant's entering the home and that the co-defendant's testimony to the contrary was unreliable. The Defendant also submits that there was insufficient evidence presented to establish his criminal responsibility for his co-defendant's actions. The State counters that the evidence was sufficient.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Aggravated burglary is the "burglary of a habitation[.]" Tenn. Code Ann. § 39-14-403(a). Burglary is committed when a person, "without the effective consent of the property owner," "[e]nters a building . . . with [the] intent to commit a felony, theft[,] or assault[.]" Tenn. Code Ann. § 39-14-402(a)(1). A habitation is defined as "any structure . . . which is designed or adapted for the overnight accommodation of persons[.]" Tenn. Code Ann. § 39-14-401(1)(A). Theft of property occurs if, with intent to deprive the

owner of property, a person knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

The State argued that, in addition to the Defendant's being the principal offender, the Defendant was guilty based upon a theory of criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). A person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2).

Although not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. Dorantes, 331 S.W.3d at 386 (citing State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." Dorantes, 331 S.W.3d at 386 (citing State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); see State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

In the light most favorable to the State, the evidence established that the Defendant was the one who devised the plan to steal the two shotguns from his father's home on May 28, 2016. Mr. Odom testified that the shotguns were located behind a cabinet in the bedroom. According to Mr. Odom, the Defendant knew where the two guns were kept, and the Defendant was also aware that the home's window remained unlocked. Aside from the jar of change and shotguns, nothing else of value was taken from inside the residence. Mr. Odom's testimony established that, while it would have been difficult for the Defendant to crawl through the window, it was not impossible as he could have "turn[ed] sideways" to accomplish his goal. Nonetheless, Mr. Odom believed that the co-defendant would have had a much easier time fitting through the window.

The Defendant testified that, while they riding around that day in the Defendant's girlfriend's Saturn, he saw his father's truck parked at church. After seeing the truck, the Defendant told the co-defendant about the shotguns at his father's house because the Defendant knew that John Sanders, to whom a debt was owed, "was also interested in purchasing shotguns." They drove by the Defendant's father's residence "once or twice" to make sure no one was home before parking and exiting the vehicle. After the

Defendant knocked on the door for about five minutes, he informed the co-defendant that "it was safe for him to go on in[.]" The Defendant testified that there was a white chair sitting near the window and that the co-defendant used the chair to enter the window.

The Defendant claimed that he next saw the co-defendant putting the jar of change and shotguns in the trunk of the car. After that, they proceeded to Kroger in Atoka to convert the change to currency. The Defendant admitted that he, along with the co-defendant, delivered the 20 gauge shotgun the following day to John Sanders to pay a drug debt. According to the Defendant, they both went in order "to make sure that neither one of [them] got screwed out the extra that was given" in return for the weapon. The Defendant, in his statement to Detective Henshaw, said that the co-defendant received a gram of methamphetamine in exchange for the 20 gauge. The Defendant also testified at trial to being present three weeks later when the 12 gauge shotgun was given to John Sanders to pay a drug debt and facilitate the sale of more drugs. Moreover, the two shotguns were found in the possession of Christy Sanders, John Sanders's wife.

The Defendant's statement to Detective Henshaw was consistent with his trial testimony. Moreover, at trial, the Defendant acknowledged that he, "at the very least[,] assisted [the co-defendant] in this aggravated burglary" and that he benefitted from the sale of the shotguns.

It is the law in Tennessee that possession of recently stolen property, unless it is satisfactorily explained, creates a permissible inference that the person who possessed the stolen property gained possession through theft. See State v. James, 315 S.W.3d 440, 450 (Tenn. 2010). Additionally, our supreme court held that a jury may "infer a burglary from possession of recently stolen property only when there exists a rational connection between possession and participation, when guilt more likely than not flows from possession, and, importantly, when there is some other evidence corroborating the burglary that warrants the inference." Id. at 452 (citing 13 Am. Jur. 2d Burglary § 48 (2009)). The commission of the aggravated burglary on May 28, 2016, was adequately corroborated by the State. The Defendant's transfer of property stolen during that burglary, on the following day, and again three weeks later, is a rational connection between the Defendant's possession of the stolen property and his participation in the aggravated burglary. Thus, the Defendant's guilt of aggravated burglary more likely than not flows from his possession and prompt sale of items stolen during the aggravated burglary.

The co-defendant provided a similar version of events other than his claiming that it was the Defendant who went inside the residence and that the Defendant was the one who owed the drug debt John Sanders. We conclude that, regardless of who went inside, the evidence showed that Defendant benefitted from the proceeds of the aggravated burglary and theft and aided his co-defendant in the commission of the offenses. See,

e.g., State v. David Roger Petty, No. M2016-01036-CCA-R3-CD, 2017 WL 4457592, at *4 (Tenn. Crim. App. Oct. 15, 2017) (finding the evidence sufficient to support aggravated burglary and theft convictions where the defendant admitted that he sold the jewelry but claimed that his co-defendant entered the home and stole it). Therefore, the evidence is sufficient to support the Defendant's convictions.

## II. *Video Footage*

The Defendant asserts that "[a]ll evidence" of his statements to Detective Henshaw was "not published to the [j]ury." In essence, the Defendant submits that the trial court's refusal to play for the jury the portion of the Defendant's police interview beginning at 10:36 a.m. on the recording, wherein the Defendant stated adamantly that he was telling the truth, was error. The Defendant raises this evidentiary challenge within his sufficiency argument and concludes as follows:

> This is not to say that [the Defendant] did not assist [the co-defendant], but when considering whether [the Defendant's] testimony is credible and the evidence of [the Defendant's] statement relating to the [a]ggravated [b]urglary . . . was not fully presented to the jury, it is necessary to consider whether the jury's observation of [the Defendant's] statement could have persuaded the jury of the truthfulness of [the Defendant's] statement.

The State responds that the Defendant has waived appellate review of the issue by failing to timely file a motion for new trial.

The Defendant is attempting to disguise his evidentiary complaint by incorporating it within his sufficiency challenge. Again, the failure to timely file a motion for new trial results in the waiver of all issues except for sufficiency of the evidence and sentencing. See Bough, 152 S.W.3d at 460; see also Tenn. R. App. P. 3(e). Accordingly, the State is correct that this issue is waived, and it is, therefore, reviewable only for plain error. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). There are five factors that must be established before an error may be recognized as plain: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the issue was not waived for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. State v. Minor, 546 S.W.3d 59, 70 (Tenn. 2018) (citations omitted); State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

The Defendant makes no argument for plain error, and as discussed above, the evidence is sufficient to support the Defendant's convictions based upon a theory that the Defendant is criminally responsible for the actions of his co-defendant. The jury could have believed that the Defendant was truthful during his interview when he claimed that it was the co-defendant who entered the residence and still found the Defendant guilty. Moreover, the record reflects that, by beginning the recording at 10:44 a.m., the State was attempting to avoid evidence of other bad acts committed by the Defendant. The trial court ruled that the State could play the recording beginning at 10:44 a.m. and that, if the defense counsel "want[ed] other parts played," then they would take a break to address those additional portions. However, after the recording was played, defense counsel never renewed her request to play any additional portions of the recording.

In addition, Detective Henshaw testified for the jury that there was a point during the interview where the Defendant asserted "over and over again" that he was telling the truth. Detective Henshaw further testified that the Defendant steadfastly maintained throughout the interview that it was the co-defendant who went inside the home. The Defendant also testified about his truthfulness during the interview, noting that he was "adamant" in the video that it was the co-defendant who went inside his father's residence. The Defendant affirmed that, during the interview, he said "no, no, hell no, this is the truth[,]" even "slap[ing] the table[,]" and that he was asked "[a]t least [twenty] times" if his statement was true. We are not compelled by the facts of the case to consider the matter as one of plain error. The Defendant is not entitled to a new trial based upon this evidentiary issue.

### III. *Theft Grading*
Although neither party addresses the application of the amended theft grading statute, we must conclude that grading the Defendant's theft conviction as a Class E felony and imposing a Class E felony, Range II offender sentence of two years constitutes plain error. At the time when the Defendant committed the theft offense and was later indicted for that offense, theft of property valued at $500 or more but less than $1,000 was a Class E felony. See Tenn. Code Ann. § 39-14-105(a) (Supp. 2016). However, effective January 1, 2017, prior to the Defendant's sentencing hearing, Tennessee Code Annotated section 39-14-105(a) was amended by the legislature. See 2016 Pub Acts, c. 906, §§ 5, 17. As is applicable in this case, the amendment provides that the theft of property valued at $1,000 or less is now a Class A misdemeanor rather than a Class E felony. See Tenn. Code Ann. § 39-14-105(a) (2018).

We agree with the panels of this court that have held that the amended grading theft statute "provides the penalty for theft based upon the value of the property taken" and, thus, "any amendment to that statute that lessens the penalty falls squarely within the

-12-

'exception' to Code section 39-11-112."[3]  State v. Michael Eugene Tolle, No. E2017-00571-CCA-R3-CD, 2018 WL 1661616, at *8-10 (Tenn. Crim. App. Mar. 19, 2018), perm. app. granted (Tenn. Aug. 9, 2018); State v. Charles Keese, No. E2016-02020-CCA-R3-CD, 2018 WL 1353697, at *7-9 (Tenn. Crim. App. Mar. 15, 2018), perm. app. granted (Tenn. Aug. 9, 2018).  But cf. State v. Ashley N. Menke, No. M2017-00597-CCA-R3-CD, 2018 WL 2304275, at *3-8 (Tenn. Crim. App. May 21, 2018) (determining criminal savings statute does not apply to punishment for theft for plea entered to Class D felony theft prior to amendment of theft statute where sentencing occurred after amendment of theft statute), perm. app. granted (Tenn. Oct. 11, 2018).  Therefore, we vacate the sentence.  Because all of the Defendant's sentences are concurrent, a remand for resentencing is not necessary. Accordingly, the judgment is modified to reflect a Class A misdemeanor conviction of theft of property valued at $1,000 or less and a sentence of eleven months and twenty-nine days.

We also note that the judgment forms for all three convictions are silent regarding whether the Defendant's sentences should run concurrently with or consecutively to one another.  Because it is clear that the Defendant's three sentences were ordered to be served concurrently with one another, we instruct that this be notated on all three judgment forms upon remand.

CONCLUSION

The evidence was sufficient to support the Defendant's convictions in this case, and the Defendant's evidentiary issue does not entitle him to relief.  However, we find as plain error the trial court's failure to apply the amended theft grading statute at sentencing, and therefore, we vacate the two-year, Class E felony sentence for the Defendant's theft conviction.  The case is remanded for entry of a modified judgment reflecting an eleven-month and twenty-nine-day sentence for a Class A misdemeanor conviction of theft of property valued at $1,000 or less.  In addition, upon remand, all three judgment forms must also reflect the concurrent nature of the sentences.  In all other respects, the judgments are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[3] The criminal savings statute found in Tennessee 39-11-112 provides as follows:

> When a penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, the offense, as defined by the statute or act being repealed or amended, committed while the statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense. Except as provided under § 40-35-117, in the event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act.

-13-